IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:18CR158 |
| v. | : | UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S |
| NASER ALMADAOJI, | : | MOTION TO SUPPRESS EVIDENCE |
| Defendant. | : | |

The Court should deny Defendant Naser Almadaoji's Motion to Suppress Evidence (Doc. No. 56). As an initial matter, the United States does not intend to use at trial any information observed or obtained from the manual search of Almadaoji's cellular telephone conducted at Chicago O'Hare International Airport on February 24, 2018, nor did the United States use any such information to obtain additional evidence against Almadaoji. Almadaoji's motion, accordingly, should be denied as moot and no hearing is required.

In any event, the manual search of Almadaoji's cellular telephone—and the attendant written recording of information observed on the phone—was proper under the border search exception to the Fourth Amendment's warrant and probable cause requirements. Alternatively, the good-faith doctrine bars the suppression of any evidence or derivative evidence obtained from the manual search.

## BACKGROUND

On February 24, 2018, Naser Almadaoji arrived at Chicago O'Hare International Airport on a flight from Frankfurt, Germany. Almadaoji's arrival at O'Hare marked his return to the United States after an approximately eight-day trip to Egypt and Jordan. Upon Almadaoji's

arrival at O'Hare, officers of United States Customs and Border Protection (CBP) selected Almadaoji for secondary questioning and screening.

As part of the screening process, CBP Officer Tripoli orally interviewed Almadaoji regarding his travel and return to the United States. In accord with standard practice, Officer Tripoli orally elicited biographical and other information from Almadaoji during the interview, including Almadaoji's name, date of birth, address, telephone number, and email account; the purpose of Almadaoji's trip; the duration of the trip; persons visited; places visited; means to pay for the trip; occupation; professional or educational affiliations; the value of any cash or other monetary instruments possessed; next destination; and entire travel itinerary. Officer Tripoli recorded Almadaoji's answers to his questions and documented those answers in a written report. *See* Exhibit A (U.S. Customs and Border Protection Report dated 02/24/2018).

When speaking to Officer Tripoli, Almadaoji claimed to have traveled by himself to Jordan and Egypt and that he returned after a taxi driver stole his backpack and $3,000. Almadaoji claimed that he had nothing booked or planned in Egypt or Jordan, and traveled to those places because they looked nice.[1] Almadaoji stated that he traveled alone the entire time and paid cash for everything.

During the interview, Almadaoji referenced U.S. airstrikes and the use of drones that "slaughtered Muslims" and stated the United States needed to leave the Middle East. Almadaoji further stated he thought about joining the Peshmergan military in northern Iraq because it was the "real force[ ] in Iraq to stop ISIS, not U.S." Almadaoji stated ISIS was "bad for killing other Muslims," but most Muslims killed by ISIS were "Shiites," and "Shiites were their [Sunnis]

---

[1] While Almadaoji did not admit to CBP that he embarked on this trip to join Wilayat Sinai (ISIS's affiliate in the Sinai peninsula), he later represented to an FBI confidential human source that he had tried to join the terrorist organization during his travels to Egypt and Jordan.

2

natural adversaries." Almadaoji explained Shiites "didn't follow true Islam" and the people of Iraq were no freer now than before ISIS invaded Iraq.

Upon conducting an examination of Almadaoji's bag, Officer Tripoli observed four shemagh-style head wraps. When Officer Tripoli asked about the shemaghs, Almadaoji responded that he liked the way they looked on "fighters." Almadaoji was asked if he had seen any fighters while overseas, and Almadaoji answered, "no not really," but stated he observed "fighters" wearing shemaghs online.

Throughout the course of the interview, Officer Tripoli conducted a manual examination of Almadaoji's cellular telephone.  Officer Tripoli noted in his report that the examination of the cellular telephone was conducted with "neg results," and that the telephone contained no photos except for two or three photos of Almadaoji's itinerary.  Officer Tripoli also noted in his report that Almadaoji had the following applications on the cellular telephone: Text Now App, Hadith App, and Kik App.

Almadaoji's interaction with Officer Tripoli lasted approximately 1 hour and 50 minutes. Officer Tripoli's manual search of Almadaoji's cellular telephone occurred intermittently in conjunction with his interview of Almadaoji.  Following the interview, Almadaoji's cellular telephone was returned and Almadaoji proceeded through customs.  Officer Tripoli contacted FBI personnel regarding his interaction with Almadaoji.  His written report was later forwarded to FBI personnel in Dayton, Ohio, who began an investigation.

**ARGUMENT**

The Court should deny Almadaoji's motion to suppress because the United States does not intend to use at trial any information that CBP observed or obtained from the manual search of Almadaoji's cellular telephone on February 24, 2018.  Nor did the United States, as suggested

3

by the defendant, use information observed or obtained from Almadaoji's cellular telephone on February 24, 2018, to obtain other evidence against him. Consequently, Almadaoji's motion is moot and no hearing is necessary.

In any event, the manual search of Almadaoji's cellular telephone was proper under the border search exception to the Fourth Amendment's warrant and probable cause requirements. Alternatively, the good-faith doctrine bars the suppression of any evidence or derivative evidence obtained as a result of the manual search.

I. **The United States Does Not Intend to Use at Trial Any Information Obtained From Almadaoji's Cellular Telephone on February 24, 2018, and Did Not Use Such Information to Obtain Other Evidence Against Almadaoji.**

Because the United States does not intend to use any information obtained or observed from the manual search of Almadaoji's cellular telephone on February 24, 2018, and did not use such information to obtain additional evidence against Almadaoji, Almadaoji's motion should be denied as moot and no hearing is necessary.[2]

As stated above, Officer Tripoli engaged in an interview of Almadaoji during the secondary screening process. Officer Tripoli orally obtained biographical and other information from Almadaoji, including his phone number, email address, and residential address. He also questioned Almadaoji about the purpose and scope of his travel, as well as items located in his luggage. Almadaoji does not argue—nor could he argue—that CBP somehow exceeded the bounds of its authority in obtaining this information from Almadaoji through an interview upon Almadaoji's return to the United States. *E.g.*, *United States v. Ozuna*, 170 F.3d 654, 658 (6th

---

[2] To be clear, Almadaoji was also in possession of the same cellular telephone upon his arrest at the John Glenn Columbus International Airport on October 24, 2018. Following the arrest, the FBI obtained a federal search warrant to search the contents of the cellular telephone. The United States does intend to introduce at trial evidence obtained pursuant to that search warrant.

Cir. 1999) ("Every day thousands of travelers enter this country and each is detained until a search has been made or his answers to questions have convinced the customs agent that no search is necessary.") (quotations omitted).

The manual search of Almadaoji's phone occurred during the course of this interview and, while appropriate as discussed below, yielded no information that the United States either intends to use at trial or used to obtain additional evidence against Almadaoji. While Almadaoji suggests that "information collected and recorded by the Agents from Mr. Almadaoji's phone during the February 24, 2018 interrogation was later used to obtain additional evidence that would not have been discovered but for the initial search of Mr. Almadaoji's phone," (Doc. No. 56 at 2, PAGEID #: 263), that is not the case. The vast majority of the information contained in Tripoli's report—including Almadaoji's name, date of birth, email address, telephone number, and residential address—was obtained orally from Almadaoji. Regarding the manual examination of the phone, Tripoli simply documented the presence of three applications and a few photos, concluding that the phone search yielded otherwise "neg results." Following the interview of Almadaoji, Officer Tripoli contacted the FBI, and Tripoli's written report was forwarded to the FBI in Dayton, Ohio, which began an investigation. None of the information observed on Almadaoji's cellular phone was used to further the investigation.

Because the United States did not use information from the manual search of Almadaoji's phone on February 24, 2018, to obtain additional evidence against Almadaoji, and because the United States does not intend to use such information at trial, Almadaoji's motion should be denied as moot and no hearing is necessary.

## II. The Manual Search of Almadaoji's Cellular Telephone Was Permissible Under the Border Search Exception.

In the alternative, Almadaoji's motion to suppress should be denied because the manual search of the cellular telephone and the written recording of certain of its contents were permissible under the border search exception to the Fourth Amendment's warrant and probable cause requirements.

The government's interest in preventing the entry of "unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). For this reason, the government has "plenary authority to conduct routine searches and seizures at the border, without probable cause or warrant . . . ." *Id.* at 153. Under this so-called "border search exception" to the Fourth Amendment's probable cause and warrant requirements, "searches of people and their property at the borders are per se reasonable, meaning that they typically do not require a warrant, probable cause, or even reasonable suspicion." *United States v. Stewart*, 729 F.3d 517, 524 (6th Cir. 2013); *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985) ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant."). This border search authority extends to "functional equivalents" of the border, including airports where international flights land. *Stewart*, 729 F.3d at 524.

Pursuant to the principles discussed above, courts have consistently held that border officials may conduct manual searches of laptops and cellular phones without reasonable suspicion. *Stewart*, 729 F.3d at 525; *United States v. Cano*, 934 F.3d 1002, 1007 (9th Cir. 2019) ("manual cell phone searches may be conducted by border officials without reasonable suspicion"); *United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018); *Alasaad v. Mayorkas*, 988 F.3d 8, 19 (1st Cir. 2021). This is so because manual searches of electronic

6

devices are considered routine in nature and far less intrusive than "forensic" searches. *See Stewart*, 729 F.3d at 525; *Cano*, 934 F.3d at 1007, 1014-16 (distinguishing manual searches from more intrusive forensic searches). A manual search generally consists of scrolling through an electronic device to view its contents, *e.g.*, *Stewart*, 729 F.3d at 521 (characterizing a search as "non-forensic" where the officer previewed the contents of a laptop while scrolling through it), while a forensic search involves the use of software to exhaustively analyze the contents of a device, potentially revealing incriminating evidence even in the device's unallocated space. *See United States v. Cotterman*, 709 F.3d 952, 967 (9th Cir. 2013) (describing a forensic search as "essentially a computer strip search").[3]

Here, it is undisputed that the search of Almadaoji's cellular telephone occurred after he had first arrived in the United States at Chicago O'Hare International Airport on an international flight from Germany. O'Hare was therefore the "functional equivalent" of the border to which the border-search authority extends. *See United States v. Yang*, 286 F.3d 940, 944 (7th Cir. 2002) ("O'Hare Airport is an international gateway into the United States, and incoming passengers from international ports are subject to border searches because the airport is the functional equivalent of an international border."). For the reasons stated below, the search of Almadaoji's cellular telephone, and the attendant written recording of information observed on the phone, was proper under the border search exception.

---

[3] Based on the differences between manual and forensic searches, some courts have held that forensic searches of electronic devices at the border require some particularized suspicion of criminal activity. *See Cano*, 934 F.3d at 1007; *United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018). At least one court, however, has held that even a forensic search can be conducted at the border without suspicion. *Touset*, 890 F.3d at 1233-1238 ("The Supreme Court has never required reasonable suspicion for a search of property at the border, however non-routine and intrusive, and neither have we."). As discussed herein, the search of Almadaoji's cellular telephone clearly was manual, and therefore the Court need not address this issue.

7

### A. The search of Almadaoji's cellular telephone was a routine manual examination that did not require reasonable suspicion.

To begin, the search of Almadaoji's cellular telephone at O'Hare by Officer Tripoli was a routine manual examination, and thus required no reasonable suspicion. In searching Almadaoji's cellular telephone, Officer Tripoli manually examined the phone, scrolling through its contents. He did not use special software or other more intrusive means to examine the contents of the phone, and no forensic download or report was generated. Consequently, this case clearly features the "commonsense differentiation" between a manual review of an electronic device and a more intrusive forensic examination involving the "application of computer software." *See Cotterman*, 709 F.3d at 967 (distinguish between manual reviews and forensic examinations).

While Almadaoji attempts to cast the search as "more than . . . a cursory examination," claiming that the government "logged and recorded certain personal and sensitive data," (Doc. No. 56 at 2, PAGEID #: 263), that assertion is unfounded. Officer Tripoli noted in his report that his search of the phone revealed a few applications (Text Now, Hadith, and Kik) and a few photos. In fact, most of the information obtained by Officer Tripoli and recorded in his report was obtained during the interview of Almadaoji, not the search of the cellular telephone. But even if all of the information about Almadaoji in Tripoli's report had come from the search of the phone, that still would not alter the character of the search. No computer software was used to conduct the search. Further, the quantity of information reflected in Officer Tripoli's report is consistent with a manual examination and pales in comparison to the trove of data that can be obtained through a forensic analysis. *Cf. Kolsuz*, 890 F.3d at 139 (describing a forensic search using Cellebrite Physical Analyzer, which involved an advanced logical extraction that yielded a 896-page report).

8

Additionally, the duration of Tripoli's interview of Almadaoji has no bearing on the determination of whether the search of the phone should be considered other than routine. Officer Tripoli's interaction with Almadaoji lasted approximately 1 hour and 50 minutes, and he manually searched Almadaoji's phone intermittently throughout the interview. The duration of the interview was reasonable in light of Almadaoji's answers to Tripoli's questions and the presence of shemaghs in Almadaoji's luggage. The duration of the interview, moreover, did not alter the routine character of the search. On this point, *United States v. Stewart* is instructive. There, the defendant arrived at the Detroit Metropolitan Airport on a plane from Japan with two laptop computers. 729 F.3d at 520. The defendant was selected for secondary inspection after giving a CBP officer potentially suspicious responses to questions. *Id*. CBP attempted to manually search one of the laptops, but was not able to conduct the search because the battery was dead and required a foreign power cord converter. *Id*. 520-21. After CBP manually searched the defendant's second laptop and found evidence of child pornography, they detained both laptops and told the defendant that he was free to leave. *Id*. at 521. CBP transported both laptops approximately 20 miles away and manually searched them the next day. *Id*. The defendant argued that the delay and distance associated with the warrantless manual searches of his laptops exceeded the bounds of the border-search exception,[4] but the court rejected the argument. The court held that the fact that the laptop was transported beyond the border and examined one day after the initial seizure did not alter the routine nature of the search. *Id*. 525-26.

---

[4] At issue in *Stewart* was whether the removal of the laptops and duration of the search transformed the search from a border search into an "extended border search" for which reasonable suspicion of criminal activity is required. *Id*. at 524.

The same conclusion holds here. That Tripoli conducted the manual search of the phone intermittently over the course of the 1-hour and 50-minute interaction with Almadaoji did not transform the manual search into something other than routine. And because the search of Almadaoji's cellphone was routine, no particularized suspicion was required.

### B. The CBP officer lawfully obtained information from Almadaoji's cellular telephone that constituted potential evidence of a transnational crime.

Not only could Officer Tripoli manually search Almadaoji's cellular telephone without any particularized suspicion, but he could also lawfully record from the phone potential evidence of transnational crimes—including the crime of providing material support to a foreign terrorist organization. Additionally, the information that Officer Tripoli recorded in writing here—applications observed on the phone and the presence of a few photographs—constitutes such potential evidence.

Based on the Ninth Circuit's decision in *United States v. Cano*—decided approximately a year and a half after Almadaoji arrived at O'Hare—Almadaoji argues that even if the search of his cellular telephone was routine, it should have been limited in scope to searches for contraband only. In *Cano*, the Ninth Circuit held that routine and non-routine border searches of cellular telephones must be restricted to searches for "digital contraband" and cannot extend to searches for evidence that would aid in prosecuting past, and preventing future, border-related crimes. 934 F.3d at 1018.

As Almadaoji recognizes, other federal circuits disagree with this recent Ninth Circuit holding. In *United States v. Kolsuz*, the Fourth Circuit approved a forensic search of the defendant's cellphone where the officers sought evidence of the defendant's attempts to export firearms illegally and without a license—a "transnational offense that goes to the heart of the border search exception." 890 F.3d at 143. The court held that because the government's search

10

of the phone was "conducted at least in part to uncover information about an ongoing transnational crime" the search "fit within the core of the rationale underlying the border search exception." *Id*. (quotations omitted).

In *Alasaad v. Mayorkas*, 988 F.3d at 2-13, the plaintiffs brought an action asserting that basic searches of electronic devices at the border without reasonable suspicion violated the Fourth and First Amendments. The plaintiffs also argued, consistent with *Cano*, that the border search exception sanctions only searches for contraband itself, and not searches for evidence of border-related crimes or contraband. *Id*. at 19. The First Circuit rejected all of plaintiffs' arguments, concluding that "a search for evidence of either contraband or a cross-border crime furthers the purposes of the border search exception to the warrant requirement." *Id*. at 19. The court characterized the Ninth Circuit's decision in *Cano* as "fail[ing] to appreciate the full range of justifications for the border search exception beyond the prevention of contraband itself entering the country." *Id*. at 21.

For the reasons stated in *Kolsuz* and *Alasaad*, this Court should decline to adopt the reasoning of *Cano*. As the First and Fourth Circuits have concluded, the justification for the border search exception goes beyond simply interdicting contraband and extends to the detection and prevention of transnational crimes. While the Sixth Circuit has yet to explicitly weigh in on this issue, one decision indicates that it would follow the reasoning in *Kolsuz* and *Alasaad*, and reject *Cano*'s narrow interpretation of the border search exception. In *United States v. Boumelhem*, 339 F.3d 414 (6th Cir. 2003), the Sixth Circuit held that the border search exception applies to exit searches. In so doing, the court noted that exit searches implicate significant government interests in not only controlling exports, but also in national security. *Id*. at 423. The court went on to reject the defendant's contention that the exit search was tainted due to the

11

joint participation of the FBI in the search, noting that Customs was pursuing its own "law enforcement objectives," that Customs agents "discovered every piece of evidence," and that Customs "had its own interests in the suspected export of weapons as a possible violation of laws that it is charged with enforcing." *Id*. at 424.

In these statements, the Sixth Circuit recognized two important points that are in line with the reasoning of *Kolsuz* and *Alasaad*. First, it recognized that the rationale for border searches not only lies in controlling exports and imports, but also in protecting national security. The detection and prevention of transnational crimes—like providing material support to a foreign terrorist organization—unquestionably is a national security interest. Second, the court, at least implicitly, recognized that the scope of a border search may extend beyond contraband to "evidence" of possible "violations" of border-related crimes. Buttressing this analysis is the fact that the Fourth Circuit, in *Kolsuz*, cited *Boumelhem* in support of its conclusion that border searches could properly be employed to search for evidence of transnational crimes, not just contraband. *See* 890 F.3d at 143.

Here, the information that CBP obtained from Almadaoji's phone, as limited as it was, could serve as evidence of a transnational crime—namely, providing material support to a foreign terrorist organization. It is well-established that a person can provide such material support by traveling to a foreign country, joining a foreign terrorist organization, receiving training, and returning to the United States to commit acts on behalf of that foreign terrorist organization. Almadaoji arrived at O'Hare from an eight-day trip to Egypt and Jordan. During the interview, he claimed that he had no travel plans, traveled alone, and paid cash for everything. He made several political statements about the United States, mentioned ISIS, and expressed a view regarding Shiite Muslims consistent with ISIS ideology. Almadaoji also had

shemagh-style head wraps in his bag and told Officer Tripoli that he liked the way they looked on "fighters."

Officer Tripoli conducted the manual search of Almadaoji's phone in conjunction with hearing Almadaoji's statements and observing the items in his luggage. In recording in writing that Almadaoji had certain applications on his phone and very few photographs of his trip, Officer Tripoli properly gathered evidence of a potentially ongoing transnational crime. It is common knowledge that foreign terrorist organizations use messaging applications to communicate. Indeed, as the evidence will show at the trial of this matter, Almadaoji used the messaging application Telegram to communicate with others that he thought were members of ISIS. The mere presence of messaging applications on Almadaoji's phone could serve as evidence of his involvement with a foreign terrorist organization. Further, the absence of any photographs from an eight-day trip could constitute evidence of an intent to hide the true nature of the travel. Officer Tripoli therefore properly recorded in writing potential evidence of an ongoing transnational crime that he observed from the phone.

In summary, the Ninth Circuit's *Cano* decision limiting the scope of border searches to searches for contraband has been rejected by two other circuit courts and appears inconsistent with views expressed in binding Sixth Circuit precedent. Based on that precedent, CBP lawfully recorded in writing information observed from Almadaoji's cellular telephone during the lawfully conducted manual search.

**III.     The Good Faith Doctrine Bars the Suppression of Any Evidence or Derivative Evidence Obtained as a Result of the Manual Search.**

Even if the United States intended to use evidence obtained from the manual search of Almadaoji's cellular telephone, or derived additional evidence from that search that it intends to

use at trial, the good faith doctrine would bar the suppression of any such evidence on the basis of the arguments in Almadaoji's motion.

In *Davis v. United States*, 564 U.S. 229, 241 (2011), the Supreme Court held that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." This holding was based on the principle that "the harsh sanction of exclusion 'should not be applied to deter objectively reasonable law enforcement activity.'" *Id.* (citing *United States v. Leon*, 468 U.S. 897, 919 (1984)); *see also United States v. Fisher*, 745 F.3d 200, 203 (6th Cir. 2014).

Here, CBP's actions were objectively reasonable based on existing border search authority. At the time of the border search of Almadaoji's phone in 2018, binding precedent in the Seventh Circuit—the location of Chicago O'Hare—and Supreme Court held that "[r]outine searches without a warrant at this country's international borders are per se reasonable." *United States v. Yang*, 286 F.3d 940, 944 (7th Cir. 2002); *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). Moreover, "the Supreme Court required no particularized suspicion for a non-destructive border search of property." *United States v. Wanjiku*, 919 F.3d 472, 485 (7th Cir. 2019). And no court had held, as *Cano* did a year and a half after the search of Almadaoji's phone, that manual searches of cellular telephones at the border were limited in scope to searches for contraband. Moreover, *Cano*'s holding is has been rejected by at least two other federal courts of appeals.

Given the state of the law at the time of the search, CBP had an objectively good-faith belief that its conduct here was lawful. The exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct. *Herring v. United States*, 555 U.S. 135, 144 (2009). For the reasons stated above, such circumstances are far from present in this case. The good faith

doctrine accordingly bars the suppression of any evidence or evidence derived from the search of Almadaoji's phone on February 24, 2018.

## CONCLUSION

For the foregoing reasons, Almadaoji's motion to suppress should be denied and no hearing on the motion is necessary.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney

s/ Dominick S. Gerace
DOMINICK S. GERACE (OH 0082823)
Assistant United States Attorney
VIPAL J. PATEL (OH 99850; CA 156212)
Acting United States Attorney
200 West Second Street, Suite 600
Dayton, Ohio 45402
Office: (937) 225-2910
Fax: (937) 225-2564
dominick.s.gerace@usdoj.gov
vipal.patel@usdoj.gov

s/Justin Sher
JUSTIN SHER (DC 974235)
Trial Attorney
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20004
Office: (202) 353-3909
justin.sher@usdoj.gov

**CERTIFICATE OF SERVICE**

This is to certify that on this 17th day of May, 2021, I filed the foregoing using the Court's ECF system, which will send electronic notification of such filing to all counsel of record.

s/ Dominick S. Gerace
DOMINICK S. GERACE (OH 0082823)
Assistant United States Attorney
