IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,  :

    Plaintiff,

v.  :  Case No. 3:18-cr-158

NASER ALMADAOJI,  JUDGE WALTER H. RICE

    Defendant.  :

---

DECISION AND ENTRY OVERRULING DEFENDANT
NASER ALMADAOJI'S SUPPLEMENTAL MOTION
TO SUPPRESS EVIDENCE (DOC. #61)

---

I.

Defendant Naser Almadaoji is charged with two counts of attempting to provide material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). In April of 2021, Defendant filed a motion to suppress all evidence obtained from a warrantless search of his cell phone. Doc. #56. That search was conducted on February 24, 2018, by United States Customs and Border Protection ("CBP") Officer Jack Tripoli, when Defendant arrived at Chicago O'Hare International Airport following an eight-day trip to Egypt and Jordan.

After the Government filed its response, Doc. #57, indicating that it did not intend to use at trial any information observed or obtained from the manual

search of the cell phone, and that it did not use any such information to obtain additional evidence against Defendant, the Court overruled Defendant's motion as moot. The Court, however, agreed to revisit the issue if Defendant had any specific reason to believe that the Government intended to use any information derived from the cell phone search. Doc. #58.

On August 30, 2021, Defendant filed a Supplemental Memorandum in Support of Motion to Suppress Evidence, Doc. #61, which the Court has construed as a Supplemental Motion to Suppress Evidence. *See* Doc. #69. Therein, Defendant denied providing his phone number or his email address to Officer Jack Tripoli or any other CBP officer. He noted, however, that this information appears in Officer Tripoli's incident report, along with a list of applications that were present on Defendant's cell phone. Doc. #61-1.

A July 2, 2018, report written by Federal Bureau of Investigation ("FBI") agents Patrick Gragan and Charles Balaj refers to "subsequent investigation steps," which led them to Defendant's YouTube and Soundcloud accounts. Doc. #61-2. Defendant maintains that it is likely that this information was extracted from his cell phone by CBP agents. He further argues that the Government could not have issued grand jury subpoenas, Doc. #61-3, containing information such as usernames and account numbers, to Google, Facebook, Snap, Inc., Twitter and other social media and messaging applications present on his cell phone without relying on biographical or identifying information that was extracted from his cell phone.

Defendant therefore requested an evidentiary hearing to determine exactly what data and biographical information was extracted from his cell phone on February 24, 2018, and what "subsequent investigative steps" were taken to uncover the data and biographical information used in connection with the grand jury subpoenas. The Government did not object to Defendant's request for a hearing.

The Court set an evidentiary hearing via videoconferencing for September 14, 2021. However, when Defendant indicated that he wanted the hearing held in person, the Court rescheduled it for September 27, 2021. Both parties were invited to file post-hearing briefs, but only the Government filed a supplemental response. Doc. #75.

## II.

Three witnesses testified at the hearing: (A) United States Customs and Border Protection ("CBP") Agent Jack Tripoli; (B) Joint Terrorism Task Force ("JTTF") Officer Kyle Metz; and (C) Defendant Naser Almadaoji. Officer Tripoli testified via video conference; the others testified in person.

### A.

Officer Jack Tripoli is a CBP agent assigned to Chicago O'Hare International Airport. The unit to which he is assigned focuses on terrorism. Doc. #74, PageID#556. Officer Tripoli testified that, on the afternoon of February 24, 2018,

Naser Almadaoji arrived at O'Hare from Frankfurt, Germany, having just spent eight days in Egypt and Jordan. *Id.* at PageID#558.

In the baggage control area, CBP Officer Nagy conducted a secondary screening of Mr. Almadaoji. After questioning him and searching his baggage, Officer Nagy escorted Mr. Almadaoji from the baggage control area to the semiprivate booth where Officer Tripoli was stationed. Nagy told Officer Tripoli that Almadaoji's travel itinerary, his behavior and his inability to answer certain questions had raised some national security concerns. Over the course of the next hour and 50 minutes, Officer Tripoli interviewed Almadaoji. *Id.* at PageID##558-60, 573, 598.

Officer Tripoli first obtained Almadaoji's current address and telephone number from the Customs Declaration Form that Almadaoji had completed. Almadaoji verbally verified that these were correct. *Id.* at PageID#561. In addition, Almadaoji told Tripoli that his email address was nasermunshid16@gmail.com. When asked about social media accounts, Almadaoji told him that he had a Snapchat account and that his username was Naser_Almadao. *Id.* at PageID#563, 578-79.

Officer Tripoli was concerned that Almadaoji had spent eight days in Egypt and Jordan, areas where there was current conflict and known terrorist activity. He became suspicious when Almadaoji could not articulate many details about his trip. Almadaoji also made several anti-American comments. Tripoli noted that,

4

despite having several cameras with him, Almadaoji had no photographs of his "vacation." *Id.* at PageID#564-65, 569.

Based on these suspicions, approximately six minutes into the interview, Tripoli decided to search Almadaoji's cell phone. He gave Almadaoji an "electronic tear sheet" which explained the Government's authority to obtain and search phones. Tripoli informed him that, unless he voluntarily submitted to a search of his phone, the Government could detain it for a forensic examination. Officer Tripoli testified that Almadaoji voluntarily submitted to a search of his cell phone, and unlocked the phone for him. Per a CBP directive governing border searches of electronic devices, Officer Tripoli had Almadaoji place the cell phone in airplane mode. This prevented the officer from accessing anything stored in the cloud. *Id.* at PageID##566, 582-83, 592.

Officer Tripoli then conducted a "basic" or "manual" examination of Almadaoji's cell phone. Essentially, he scrolled through the phone to view its contents. *Id.* at PageID#567. He did not hook the phone up to any forensic evaluation equipment and did not download its contents. *Id.* In fact, Officer Tripoli had no equipment in his booth to conduct a forensic search. *Id.* at PageID#584. Almadaoji had only two or three photos on his phone, and these were of his itinerary. He had only three apps—TextNow, Hadith and Kik. *Id.* at PageID#568. As he searched the cell phone, Officer Tripoli continued to interview Almadaoji. When Officer Tripoli searched Almadaoji's bag, he found four

shemagh-style headwraps. Almadaoji told Tripoli that he liked the way they looked on the fighters he saw online. *Id.* at PageID#569, 596-97.

Following this secondary screening, Officer Tripoli returned Almadaoji's cell phone to him and permitted him to leave. Officer Tripoli then referred the matter to the Joint Terrorism Task Force ("JTTF"), attaching a copy of the incident report he had created during the course of the interview. *Id.* at PageID#570.

**B.**

Joint Terrorism Task Force ("JTTF") Officer Kyle Metz testified next. Metz is a detective with the Greene County Sheriff's Office, assigned to the FBI's JTTF. *Id.* at PageID#600-01. After receiving Officer Tripoli's report, the FBI opened an investigation into Mr. Almadaoji. It searched existing databases and law enforcement records and conducted Google searches. Based on the telephone number and email address found in Officer Tripoli's report, the JTTF also conducted an "open source" check of publicly available information. *Id.* at PageID##604-05. When the JTTF subpoenaed Google for information about the email address that Almadaoji had provided to Officer Tripoli, it learned of a second email address, abubadraliraqi@gmail.com, which was Almadaoji's recovery email address. *Id.* at PageID##607-08.

Through this open source check of Almadaoji's cell phone number and two email addresses, the JTTF was able to learn of Almadaoji's Telegram account, which Almadaoji later used to communicate with the FBI's undercover agent. Through the open source check, the JTTF also learned of Almadaoji's accounts

6

with Twitter, Google, Skype, SoundCloud, Tango and Tumbler. *Id.* at PageID##609-12. Officer Metz testified that none of the subpoenas issued to these agencies was obtained with information found during Officer Tripoli's manual search of Almadaoji's phone. *Id.* at PageID##614, 616.

### C.

Mr. Almadaoji then testified for the limited purpose of responding to Officer Tripoli's testimony. Almadaoji testified that, when he arrived at the airport, Officer Nagy asked him where he had been. He told the officer that he had been on vacation in Egypt and Jordan. Officer Nagy checked his baggage and saw two shemaghs. When he asked Almadaoji what they were, he responded that they were traditional. Officer Nagy then escorted him to Officer Tripoli, who asked to see Almadaoji's cell phone and passport. Officer Tripoli handed Almadaoji an electronic tear sheet explaining that if he refused to allow a search of his phone, it could be detained. Almadaoji testified that he agreed to give Officer Tripoli his phone, his phone number and his password. However, he does not remember being asked to put the cell phone in airplane mode. *Id.* at PageID##621-22.

According to Almadaoji, Officer Tripoli had him sit approximately 25-30 feet away while he searched his phone for 20-30 minutes. He then called him back over and questioned him for about an hour. Almadaoji claims that, although Officer Tripoli searched the bag and viewed the cameras, he did not examine them to determine whether he had taken any photographs. When asked about

7

the shemaghs, Almadaoji explained that they were traditional. He denied telling Tripoli that he liked the way they looked on fighters. *Id.* at PageID##621-23, 628.

Despite Almadaoji's testimony that he "did give [Officer Tripoli] my phone number, and I did give him my password," he later stated, "I never verbally gave Officer Tripoli my phone number, my email address or my Snapchat account or any other social media that I had." *Id.* at PageID##622-23.

On cross-examination, Almadaoji admitted that he had lied to Officer Tripoli about the purpose of his trip. He admitted that, instead of traveling to Egypt and Jordan for "vacation," he traveled there to attempt to join ISIS Wilayat Sinai. *Id.* at PageID##624-25, 631.

### III.

Almadaoji argues that Officer Tripoli's warrantless search of his cell phone violated his Fourth Amendment right to be free of unreasonable searches and seizures. Based on the parties' briefs, the hearing testimony and the relevant law, the Court rejects Defendant's argument that this search was unconstitutional.

At the hearing, Almadaoji admitted that, after reading the electronic tear sheet provided by Officer Tripoli, he expressly gave consent for the search and unlocked his phone for the officer. Doc. #74, PageID#622. However, even if he had not done so, the search fell squarely within the scope of a permissible border search. At the very least, Officer Tripoli acted in good faith. For each of these

8

reasons, the Court OVERRULES Defendant's Supplemental Motion to Suppress Evidence, Doc. #61.

### A.

Even if Almadaoji had not consented to a search of his cell phone, Officer Tripoli acted within constitutional bounds. The Supreme Court has held that, at the international borders, "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985).[1] This is because the "Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).

There is a "longstanding recognition" that border searches are reasonable despite the lack of probable cause or a warrant. *United States v. Ramsey*, 431 U.S. 606, 619 (1977). There are, however, limits to the border search exception. Routine searches are *per se* reasonable and do not typically require a warrant, probable cause or reasonable suspicion. *United States v. Stewart*, 729 F.3d 517, 524 (6th Cir. 2013). Non-routine searches, however, require reasonable suspicion. *Montoya de Hernandez*, 473 U.S. at 541. "The degree of invasiveness or intrusiveness associated with any particular type of search determines whether or

---

[1] International airports, like Chicago O'Hare, are the "functional equivalent" of an international border. *United States v. Stewart*, 729 F.3d 517, 525 n.3 (6th Cir. 2013).

9

not that search qualifies as routine." *United States v. Braks*, 842 F.2d 509, 511 (1st Cir. 1988). Examples of "non-routine" searches include strip searches, body cavity searches and destructive searches of property. *See Montoya de Hernandez*, 473 U.S. at 541-42; *Flores-Montano*, 541 U.S. at 155-56.

In *Riley v. California*, 573 U.S. 373 (2014), the Supreme Court concluded that officers cannot search a cell phone as part of warrantless search incident to arrest. In so holding, it noted that cell phones implicate significant privacy concerns. *Id.* at 393. The Eleventh Circuit has recognized, however, that "*Riley*, which involved the search-incident-to-arrest exception, does not apply to searches at the border." *United States v. Toucet*, 890 F.3d 1227, 1234 (11th Cir. 2018). *See also United States v. Cano*, 934 F.3d 1002, 1015 (9th Cir. 2019) (noting that this difference is "critical.").

Accordingly, even though searches of cell phones and other electronic devices implicate significant privacy concerns, the constitutional limits for border searches remain the same.[2] Those limits depend on whether the search is a manual search or a forensic search. A manual search, whereby an officer simply scrolls through the device to view its contents, is classified as "routine" border search for which no warrant, reasonable suspicion or probable cause is required.

---

[2] *See Cano*, 934 F.3d at 1016 ("post-*Riley*, no court has required more than reasonable suspicion to justify even an intrusive border search."); *United States v. Laynes*, 481 F. Supp. 3d 657, 664 (S.D. Ohio 2020) (Barrett, J.) ("No case post-*Riley* has limited the Government's authority to conduct suspicionless manual searches of electronic devices at the international border.").

Such a search is *per se* reasonable. A forensic search, which involves the use of computer software to analyze the contents of an electronic device, constitutes a "non-routine search" and requires reasonable suspicion that the person is engaged in criminal activity. *United States v. Cotterman*, 709 F.3d 952, 960, 968 (9th Cir. 2013). *See also Cano*, 934 F.3d at 1016 ("manual searches of cell phones at the border are reasonable without individualized suspicion, whereas the forensic examination of a cell phone requires a showing of reasonable suspicion.").

In Almadaoji's case, there is no doubt that the search of his cell phone was a manual, routine search. Officer Tripoli simply scrolled through the contents of Almadaoji's cell phone and noted what he found. He did not conduct a forensic search of the cell phone; in fact, he testified that he lacked the capability to do so at his booth. As such, no warrant, no probable cause and no reasonable suspicion was required. The search fell squarely within the scope of the Fourth Amendment's border search exception.

Moreover, based on the testimony of Officer Tripoli and Officer Metz, the Court is satisfied that none of the information obtained from the February 24, 2018, manual search of Almadaoji's cell phone was used to obtain other evidence that may be used against him.[3] As Officer Metz explained, all of the information

---

[3] Pursuant to a later search warrant, the Government conducted a separate search of Almadaoji's phone on October 24, 2018. Although the Government intends to introduce evidence obtained from that search, it does not intend to introduce any evidence obtained from the search of his cell phone on February 24, 2018.

11

needed to conduct the open source queries and issue the subpoenas related to Almadaoji's social media accounts came from the telephone number and email address that Almadaoji provided to Officer Tripoli.

Almadaoji's testimony that he never gave Officer Tripoli his phone number or email address, Doc. #74, PageID#623, is simply not credible. Just moments earlier, Almadaoji admitted that he *did* give Officer Tripoli his phone number and password. *Id.* at PageID#622. In addition, Officer Tripoli testified that he routinely asks for a phone number and email address, and if an individual refuses to provide either, that would be noted in his report. *Id.* at PageID##562-63. Almadaoji's admission, at the hearing, that he lied to CBP officers when he told them that he traveled to Egypt and Jordan on "vacation," further impugns his credibility.

One final issue merits discussion. Citing *United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019), Defendant argues that, even if this was a routine border search, the CBP officers exceeded the proper scope of the search. In *Cano*, which was decided after the incident in question, the court held that a routine border search is limited to a determination of whether the phone contains *digital contraband* such as child pornography. Officers are not permitted to search the phone for evidence of a past or future border-related crime. *Id.* at 1018.

No court other than the Ninth Circuit, however, has taken such a restrictive view. In *Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021), the First Circuit held that "*Cano* fails to appreciate the full range of justifications for the border search

12

exception. . . . Advanced border searches of electronic devices may be used to search . . . for evidence of activity in violation of the laws enforced or administered by CBP or ICE." *Id.* at 21. Likewise, in *United States v. Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2018), involving evidence of illegal exportation of firearms, the Fourth Circuit held that "[t]he justification behind the border search exception is broad enough to accommodate not only the direct interception of contraband as it crosses the border, but also the prevention and disruption of ongoing efforts to export contraband illegally."

Although the Sixth Circuit has not directly weighed in on this particular issue, it has held that the border search exception extends to the exit search of an outgoing cargo container containing weapons, given that this "implicates significant government interests in the realms of national security and relations with other nations." *United States v. Boumelhem*, 339 F.3d 414, 423 (6th Cir. 2003). Given this expansive view of the border search exception, the Court believes that it is unlikely that the Sixth Circuit would limit routine border searches of cell phones to searches for digital contraband.

For these reasons, the Court concludes that Officer Tripoli's routine search of Almadaoji's cell phone passes constitutional muster.

**B.**

Even if the Court had found that the search of Almadaoji's cell phone violated his Fourth Amendment rights, there would be no legal basis to exclude

13

the evidence. At the very least, Officer Tripoli had an objectively good faith belief that he was authorized to conduct a manual search of Defendant's cell phone.

At the time of the search, the Supreme Court had held that routine border searches of persons and their belongings did not require reasonable suspicion, probable cause or a warrant. *Montoya de Hernandez*, 473 U.S. at 538. Moreover, even though the Supreme Court, in *Riley*, acknowledged the significant privacy interests associated with searches of cell phones and other electronic devices, that case did not limit the Government's authority to conduct manual searches of those devices at the border. *See Laynes,* 481 F. Supp. 3d at 665. In addition, *Cano*, the Ninth Circuit case which limited a manual search of electronic devices to a search for *digital contraband*, had not yet been decided.

In short, it was objectively reasonable for Officer Tripoli to believe that he had the authority to conduct a manual search of Almadaoji's cell phone. The good-faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984), therefore applies, and suppression of the evidence is not justified in this case.

**IV.**

For the reasons set forth above, the Court OVERRULES Defendant's Supplemental Motion to Suppress Evidence, Doc. #61.

14

Date: October 13, 2021

*Walter H. Rice*
WALTER H. RICE
UNITED STATES DISTRICT JUDGE